IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

RONNIE DOOLEY, individually and on
behalf of all others similarly situated

         Plaintiff,

                                    3:12-cv-01207-PK

                                    FINDINGS AND
                                    RECOMMENDATION

RONALD SAXTON, RODERICK C.
WENDT, R. NEIL STUART, and JELD-
WEN EMPLOYEE STOCK OWNERSHIP
& RETIREMENT PLAN,

         Defendants.

PAPAK, Judge:

       Plaintiff Ronnie Dooley brings this class action under the Employee Retirement Income

Security Act of 1974 ("ERISA") against the Jeld-Wen Employee Stock Ownership & Retirement

Plan ("the Plan"), and the three administrators and trustees of the Plan: Jeld-Wen's President and

Chief Executive Officer Roderick Wendt, Jeld-Wen's Executive Vice President and Chief

Administrative Officer Ronald Saxon, and Jeld-Wen's Executive Vice President and Chief

Financial Officer R. Neil Stuart. Dooley alleges that amendments made to the Plan in November

Page 1 - FINDINGS AND RECOMMENDATION

2010 violated ERISA's anti-cutback provision, 29 U.S.C. § 1054(g), and that the Plan fiduciaries breached their duties under 29 U.S.C. § 1104 by implementing those amendments. Now before the court are defendants' motion to stay the proceeding pending Dooley's exhaustion of his administrative remedies (#43) and Dooley's motion to compel (#39.) For the reasons discussed below, the motion to stay should be denied and the motion to compel should be granted.[1]

## BACKGROUND

### I.    The Plan

Plaintiff Ronnie Dooley worked for Jeld-Wen in Des Moines, Iowa, until he was terminated in 2007. (Compl., #1, ¶ 11.) He participated in the Jeld-Wen Employee Stock Ownership & Retirement Plan. *Id.* at ¶ 4. The Plan is a defined contribution plan under ERISA, meaning that a participant's retirement benefits are based on the amount contributed to the participant's account and any subsequent gains or losses to that amount. *See* 29 U.S.C. § 1002(34). In particular, the Plan is designed as an employee stock ownership plan (ESOP) such that plan contributions are invested in (and therefore valued by reference to) company stock, giving the Plan participants an ownership interest in the company. (Compl., #1, ¶¶ 4,9, Ex. A at § 1.1.) Under the Plan as it existed before November 2010, participants build equity through one-time employer contributions ("Basic Company Contribution"), annual employer contributions ("Regular Company Contributions") and employee contributions ("Elective

---

[1] This court recognizes that where a plaintiff seeks injunctive relief, a magistrate lacks the authority under 28 U.S.C. § 636(b)(1) to stay an action for plaintiff's failure to exhaust administrative remedies. *See Reynaga v. Cammisa*, 971 F.2d 414, 416–417 (9th Cir. 1992). Because Dooley prays for the court to award injunctive relief in the form of an equitable accounting and an independent investigation, this court addresses defendants' motion to stay in a Findings and Recommendation instead of an Opinion and Order.

Deferrals"). *Id.* at ¶10. Upon termination of employment, the former employee can no longer participate in the Plan. *Id.* at ¶18, §9.4. The former employee's accounts are valued based on the worth of Jeld-Wen stock at the "next preceding or coinciding" valuation date. (Compl., #1, ¶14, Ex. A at § 7.6.) If the employee is terminated from employment after becoming fully vested but before turning 55, the employee can take a distribution in the year following his termination consisting of his own employee contributions and any one-time employer contributions. (Compl., #1, ¶¶12,13, Ex. A at §§ 10.4(b)(ii)(a),(b)). The former employee, however, cannot take a distribution of any annual employer contributions until he turns 55, or until six years after termination, whichever comes first. *Id.* Following termination, all of the undistributed contributions remain in an account with the Plan and the account is "credited with interest at the Local Passbook Rate in effect" for that year. *Id.* at ¶15, Ex. A at §§ 7.1(h), 7.8(b). The Local Passbook Rate is defined as "the Wells Fargo Bank passbook rate of interest credited from time to time to savings accounts; however, the minimum rate shall be 3% and the maximum rate shall be 5%." *Id.* at ¶16, Ex. A at § 2.40.

When Dooley was terminated in 2007, he had not turned 55. (Compl., #1, ¶17.) Pursuant to the Plan's terms, on December 12, 2008 Dooley withdrew his one-time employer contribution and his employee contributions from the Plan, along with what appears to be a pro rata share of the 3% interest that had accrued on those balances in 2008. (P.'s Resp., #47, Exs. A, B.) Dooley's annual employer contributions of approximately $140,000 remained in the Plan accruing interest during 2009, reaching over $145,000 by the end of that year. *Id.*, Ex. C.

Jeld-Wen's stock is not publically traded. Starting in 2007, the value of Jeld-Wen's stock began to fall. (Compl., #1, ¶29.) At the end of 2007, the year Dooley was terminated, the stock

was valued at $746 per share. *Id.* By the end of 2008, the stock had fallen to $507 per share. *Id.* At the end of 2009, the stock was valued at $417 per share. *Id.* Finally, at the end of 2010, the stock was valued at $364 per share. *Id.*

## II.    The November 2010 Amendment

On November 19, 2010, Jeld-Wen amended the Plan in a number of ways, one of which is the focus of this action. The November 2010 amendment eliminated the provision allowing undistributed accounts of terminated employees to remain in the Plan as cash and accrue interest. (Compl., #1, ¶21, Ex. B at §7.8)  Instead, those accounts were to "share in the allocation of [the Plan's] income, gains, and losses" and "[p]lan expenses," the same as accounts for current employees. *Id.* This aspect of the amendment was made retroactive to January 1, 2010. *Id.* at ¶23, Ex. B.  Plaintiff alleges that the amendment had the effect of devaluing the accounts of terminated employees by: (1) devaluing the undistributed accounts by the proportion of decline in the price of Jeld-Wen stock between January 1, 2010 and the date of the amendment; (2) retroactively eliminating interest accrued during 2010; and (3) retroactively imposing an expense fee for 2010. *Id.* at ¶¶26, 27, 30.  For example, as a result of the November 2010 amendment, in 2010 Dooley's account lost approximately $3,800 in interest, was charged a 1% administrative fee of over $1,400[2], and otherwise declined in value over $18,000, or about 15 % of its value at the beginning of the year. *Id.* at ¶¶26,30,75.

## III.    Procedural History

It is undisputed that Dooley never filed a claim for benefits under the Plan.  Instead,

---

[2] If the same 1% expense fee was charged to every account in the Plan, it appears the Plan would have collected over $3.35 million in expenses during 2010, despite that actual expenses for the Plan's administration during 2010 were only $264,146. (Compl., #1, ¶¶79,80.)

Dooley filed the present action on July 5, 2012 seeking to represent a class of similarly situated former Jeld-Wen employees. (Compl., #1.) As Dooley clarified at oral argument, his complaint advances alternative theories of recovery, one characterizing the November 2010 amendment as the Plan's revaluation of Dooley's account, and the other viewing the November 2010 amendment as triggering an investment of Dooley's account in Jeld-Wen stock. Counts I and II state Dooley's revaluation theory. In Count I, Dooley asserts an anti-cutback claim under 29 U.S.C. § 1054(g) against the Plan itself for instituting an amendment to the Plan that changed the valuation of Dooley's account from a fixed dollar amount to one linked to Jeld-Wen stock prices. Dooley alleges that the amendment had the effect of diminishing the value of the account and eliminating guaranteed interest. In Count II, Dooley asserts a claim against the individual defendants for breaching their fiduciary duties under 29 U.S.C. §1104(a)(1)(D) by making an unlawful cutback of accrued benefits, as described in Count I. Count III presents the investment theory, alleging that the individual defendants breached their fiduciary duties under 29 U.S.C. §1104(a)(1)(A) & (B) by making a retroactive investment of Dooley's account into Jeld-Wen stock as of January 1, 2010, even though they knew that the stock's value had since fallen. In addition to the alternatively pled revaluation and investment theories, Dooley also alleges in Count IV that the individual defendants breached their fiduciary duties under 29 U.S.C. §1104(a)(1)(A) & (B) by charging grossly excessive administrative fees to individual Plan accounts.

Defendants answered Dooley's complaint on September 13, 2012. Defendants denied that the November 19, 2010 value of Jeld-Wen stock was lower than the January 1, 2010 value of $417, alleging instead that the stock was valued at approximately $468.50 on November 19,

2010. *Id.* at ¶27. Defendants also asserted as an affirmative defense that Dooley and the class

members' failure to exhaust administrative remedies. *Id.* at 12. The same day defendants

answered Dooley's complaint, the Administrative Committee[3] of the Plan notified Dooley's

counsel that it was "in receipt of Mr. Dooley's . . . claim for benefits filed in the District Court of

Oregon" and signaling its intention to "investigate, analyze and adjudicate" Dooley's claim,

effectively treating the initial pleading in this case as an administrative claim for benefits under

the Plan. (D.'s Memo., #44, Ex. A.)

## LEGAL STANDARD

### I.     Motion to Stay

The district court has inherent authority to stay an action before it, pending resolution of

administrative proceedings which bear upon the case, if a stay is "efficient for its own docket and

the fairest course for the parties." *Leyva v. Certified Grocers of Cal., Ltd.,* 593 F.2d 857, 864

(9th Cir.1979). "A stay should not be granted unless it appears likely the other proceedings will

be concluded within a reasonable time in relation to the urgency of the claims presented to the

court." *Id.* "If there is even a fair possibility that the stay . . . will work damage to someone else,

the party seeking the stay must make out a clear case of hardship or inequity." *Lockyer v. Mirant*

*Corp.,* 398 F.3d 1098, 1111 (9th Cir. 2005) (internal quotations omitted).

### II.    Motion to Compel

Federal Civil Procedure Rule 26(b)(1) provides that "any matter, not privileged, that is

relevant to the claim or defense of any party" is discoverable, and that "[r]elevant information

---

[3] The three individual defendants in this action are also members of the Administrative
Committee of the Plan. (Answer, #37, ¶31); (D.'s Memo., #44, at 5.)

need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). However, district courts have discretion to limit the scope of discovery if: (i) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information sought; or (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues. Fed. R. Civ. P. 26(b)(2)(C).

## DISCUSSION

### I.    Motion to Stay

Defendants style this motion as a request for the court to exercise its discretion under its inherent powers and stay proceedings while the Plan evaluates what defendants characterize as Dooley's administrative claim for benefits. However, defendants fail to recognize that the applicability of the ERISA administrative exhaustion requirement is a pure question of law, not a discretionary decision. *See Diaz v. United Agr. Employee Welfare Ben. Plan & Trust*, 50 F.3d 1478, 1483 (9th Cir. 1995). Accordingly, the court addresses the question of whether Dooley *must* exhaust his administrative remedies before filing the instant action. If exhaustion is not required, a stay would be pointless. I consider that question separately for Dooley's anti-cutback claim (Count I) and his three fiduciary duty claims (Counts II, III, and IV), and conclude that administrative exhaustion is not required for any of Dooley's claims.

### A.    Anti-Cutback Claim

Although ERISA does not contain any explicit exhaustion requirement, the Ninth Circuit

has concluded that "federal courts have the authority to enforce the exhaustion requirement in

suits under ERISA, and that as a matter of sound policy they should usually do so." *Vaught v.*

*Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 626 (9th Cir. 2008) (internal quotation

omitted). "[A] primary reason for the exhaustion requirement . . . is that prior fully considered

actions by pension plan trustees interpreting their plans and perhaps also further refining and

defining the problem in given cases, may well assist the courts when they are called upon to

resolve the controversies." *Amato v. Bernard*, 618 F.2d 559, 568 (9th Cir. 1980). Thus,

exhaustion is ordinarily required where an action seeks "a declaration of the parties' rights and

duties' under the pension plan." *Fujikawa v. Gushiken*, 823 F.2d 1341, 1346 (9th Cir. 1987).

However, "[e]xhaustion of internal dispute procedures is not required where the issue is whether

a violation of the terms or provisions of the statute [ERISA] has occurred." *Fujikawa*, 823 F.2d

at 1345. Therefore, to determine whether administrative exhaustion is required for an ERISA

claim, courts analyze whether the claim arises under the employee benefit plan or under ERISA

itself. *Graphic Commc'ns Union, Dist. Council No. 2, AFL-CIO v. GCIU-Employer Ret. Ben.*

*Plan*, 917 F.2d 1184, 1187 (9th Cir. 1990).

ERISA's anti-cutback provision, 29 U.S.C. § 1054(g), generally prohibits a pension plan

from decreasing any "accrued benefit of a participant under a plan" through a plan amendment.

29 U.S.C. § 1054(g)(1). Courts in the Ninth Circuit have uniformly held that ERISA anti-

cutback claims are claims arising under ERISA, not under individual benefit plans, and therefore

do not require administrative exhaustion. *See Barnes v. AT & T Pension Ben. Plan*, No. C

08–04058 MHP, 2010 WL 1340543, at *5 (N.D. Cal. Apr. 5, 2010); *Traylor v. Avnet, Inc.*, No.

CV–08–0918–PHX–FJM, 2009 WL 383594, at *5 (D.Ariz. Feb. 13, 2009); *Goodin v. Innovative*

*Tech. Solutions, Inc.*, 489 F.Supp.2d 1157, 1162–1163 (D.Haw. 2007).

      Defendants do not cite any cases in this circuit or any other – and this court does not find

any – holding that a plaintiff is required to administratively exhaust an anti-cutback claim.

Instead, defendants argue that Dooley's particular anti-cutback claim requires input from the Plan

administrator on the nature of Dooley's pre-amendment entitlements, namely the value of

Dooley's account just prior to the November 19, 2010 amendment and whether Dooley's account

was entitled to be credited with interest on his undistributed account on a pro rata basis.  Both of

these questions, defendants insist, require an interpretation of the Plan itself.  I evaluate the two

aspects of Dooley's anti-cutback claim separately and find that neither requires interpretation by

the Plan administrator.

      **1.**    **Revaluation**

      The parties do not dispute that Dooley's account was fully vested prior to the November

2010 amendment, but they disagree about the manner in which the account was valued.  Dooley

alleges that the value of his account was essentially fixed at the time of his termination from

Jeld-Wen and that the Plan amendment impermissibly cut back those accrued benefits by

revaluing the account according to the company's share price.  (Compl., #1, ¶¶51-54.)  By

contrast, defendants briefing assumes that the value of Dooley's account pre-amendment was *not*

a fixed dollar amount, but rather was still tied to the value of Jeld-Wen shares.  (D.'s Memo.,

#44, at 8.)

Defendants' provide no citation to the record to support their contention, and their

position is plainly contradicted by the explicit language of the Plan. Section 7.6 provides that,

upon termination, a participant's account is valued based on the appropriate Valuation Date and

adjusted for subsequent employee withdrawals and employer contributions. (Compl., #1, Ex. A

at § 7.6.) Any undistributed accounts thereafter are valued as provided in Section 7.8 of the Plan.

*Id.* Section 7.8 makes clear that undistributed accounts no longer fluctuate in value with

reference to the company stock, providing that if distribution of a former employee's account is

deferred, as Dooley's was:

> the value of the Participant's Account shall be the value of the Participant's Account on
> the December 31 coinciding with or following the Participant's Separation from Service.
> The Account shall be credited with interest at the Local Passbook Rate in effect for such
> year. The Account shall not be credited with any further contributions, Forfeitures, *or for
> any appreciation or depreciation in value of Company Stock* held by the Trust after the
> December 31 Valuation Date used to value the Account.

*Id.* at § 7.8(b) (emphasis added).   In other words, after Dooley's account was valued post-

termination, the remainder of Dooley's account that he could not withdraw was effectively held

in cash, accruing interest. It no longer fluctuated with the value of Jeld-Wen stock.

Where the explicit language of an ERISA plan describes the plaintiff's rights and

benefits, it is the court's role– not the plan's– to determine whether a subsequent amendment of

the plan violated ERISA's anti-cutback provision. *Cf. Goodwin*, 498 F.Supp.2d at 1161 n. 6,

1163 (finding no administrative exhaustion on ERISA anti-cutback claim was required where the

"explicit terms" of an ERISA plan amendment eliminated plaintiff's entitlement to put options

for distributions of privately held company stock). As the above analysis demonstrates,

defendants have failed to show that Dooley's anti-cutback claim requires an interpretation of the

Page 10 - FINDINGS AND RECOMMENDATION

Plan regarding the manner in which Dooley's account was valued before the November 2010 amendment. Because the Plan fixed the value of that account prior to the amendment, I reject any argument offered by defendants that relies on the premise that the Plan must be consulted first to determine the proper valuation of Jeld-Wen stock immediately before the amendment took effect.

Even assuming *arguendo* that defendants are correct and Dooley's account immediately prior to the amendment was valued according to the Jeld-Wen stock price, I would still find that no Plan interpretation is necessary. Determining the value of Jeld-Wen stock at the moment before the Plan was amended, and thus the value of Dooley's account pre-amendment, is a matter of purely factual dispute, not plan interpretation. Dooley alleges that Jeld-Wen's stock was worth less than $417 per share on November 19, 2010, while defendants assert that the value of Jeld-Wen stock on that date was approximately $468.50. (Compl., #1, ¶27); (Answer, #37, ¶27.) The existence of such a factual dispute does not transform an otherwise statutory anti-cutback claim into a claim for entitlement to benefits under the Plan requiring exhaustion. *See Traylor*, 2009 WL 383594, at *5 (the existence of a "factual issue" concerning the effective date of a plan amendment and, thus, whether a new plan superceded that amendment, "does not trigger the need for exhaustion."). If a factfinder determined Jeld-Wen stock was worth more on November 19, 2010 than on January 1, 2010, retroactive revaluation of Dooley's account at the lower January 1 price would have increased his account's value, and the revaluation component of his anti-cutback claim would fail. If, conversely, the stock was worth less on November 19 than on January 1, retroactive revaluation of Dooley's account using that higher price would have

Page 11 - FINDINGS AND RECOMMENDATION

reduced his benefits, and this aspect of his anti-cutback claim would succeed.  In sum, even if the court accepts defendants' flawed assumption about the valuation of Dooley's account prior to the amendment, no administrative exhaustion is required.

### 2.    Interest

The second half of Dooley's anti-cutback claim concerns elimination of interest earned in the nearly 11 months prior to the November 19, 2010 amendment.  The Plan states that interest is to be "credited . . . at the Local Passbook Rate in effect" for any given year, but does not say when or how often the interest is credited.  (Compl., #1, ¶15, Ex. A at § 7.8(b).)  The Plan's definition of Local Passbook Rate does not provide any more clarity, since it defines the rate in part as "the Wells Fargo Bank passbook rate of interest credited from *time to time* to savings accounts . . . " without specifying how frequently – daily, monthly, or yearly– the interest is to be credited.  *Id.*, ¶16, Ex. A, at §2.40) (emphasis added).  Thus, if the record were restricted to the Plan provisions only, I would find that interpretation of the Plan is required to determine whether Dooley indeed was entitled to pro rata crediting of interest under the pre-amendment Plan.

Dooley, however, notes that the Plan has already taken a position on his pre-amendment entitlement to pro rata interest by actually paying out a pro rata share of interest on his 2008 account.[4]  Thus, Dooley argues that the Administrator has already effectively interpreted the pre-

---

[4] The math is detailed in footnote 1 of Dooley's response brief.  (#47, at 1.)  In short, Dooley received a distribution on December 12, 2008, including interest of $4,163.80.  That interest amounts to a pro rata share of interest for the period from January 1, 2008 through December 12, 2008, assuming that simple interest accrued annually at a rate of 3%.  The annual simple 3% interest would come to $4,404.47.  Dividing $4,404.47 by $4,163.80 approximates the fraction 346/366, which corresponds with the portion of the year covered by the December 12, 2008 distribution.

amendment Plan to entitle participants to daily pro rata crediting of annually compounded

interest, not a single annual crediting of such interest at the end of the year. Put another way,

Dooley essentially posits that the Plan administrator is estopped from interpreting the pre-

amendment Plan in a manner inconsistent with its prior decision to credit pro rata interest.

Notably, defendants do not respond to this argument. That omission is telling. Defendants are

estopped from taking a position potentially inconsistent with their previous treatment of Dooley's

interest. No interpretation of the Plan language is therefore necessary to establish that under the

pre-amendment Plan provisions Dooley was entitled to a pro rata crediting of accrued interest.

Since neither aspect of Dooley's anti-cutback claim requires the Plan administrator to

interpret Dooley's entitlement to benefits under the Plan, Dooley's claim arises under ERISA,

not the Plan itself. *See Graphic Communications Union*, 917 F.2d at1187. Therefore, Dooley is

not required to administratively exhaust his anti-cutback claim.[5]

### B.    Breach of Fiduciary Duty Claims

Defendants argue that Dooley is also required to exhaust his breach of fiduciary duty

claims. Defendants contend that Count II in Dooley's complaint is nothing more than an anti-

cutback claim couched in the format of a breach of fiduciary duty claim and that Count III is

merely pled as an alternative theory to Count II. Finally, defendants propose that although Count

---

[5] Dooley also contends that even if exhaustion of his anti-cutback claim was otherwise
required, exhaustion would be futile in this instance because the Plan has already signaled its
position by denying allegations fundamental to his claims in defendants' answer in this suit, and
because the individual defendants who serve on the Plan's Administrative Committee are
conflicted. I disagree, but need not address those arguments at length because I find that Dooley
was not required to exhaust his claim in the first place.

IV (alleging breach of fiduciary duty for excessive expense charges) does not require exhaustion, it should be stayed anyway while the other claims are exhausted because it arises out of substantially the same facts as the other claims.

Defendants rely on a single case, *Diaz v. United Agricultural Employee Welfare Benefit Plan and Trust*, for the proposition that exhaustion of these claims is required. But *Diaz* is inapposite. There, plaintiff sought benefits for medical coverage under an ERISA plan for treatment his daughter received after he had been terminated from employment. 50 F.3d 1478, 1482 (9th Cir. 1995). The plan denied his administrative claim for benefits based on the plan's pre-existing limitations provision. *Id.* Plaintiff did not appeal the decision administratively as permitted by the plan, but instead brought suit in the district court under ERISA. *Id.* The court granted summary judgment against plaintiff because he had failed to exhaust administrative remedies. *Id.* at 1483. On appeal, plaintiff argued that he was excused from administrative review because his suit was premised on a violation of COBRA, 29 U.S.C. § 1166, not on a violation of the terms of the plan. *Id.* Plaintiff insisted the plan had violated COBRA when it failed to notify him of the right to continue coverage at his own expense within 14 days of learning that he was terminated. *Id.* However the Ninth Circuit agreed with the district court that plaintiff was required to exhaust, indicating that although a plaintiff's claim may "implicate" statutory requirements imposed by ERISA or COBRA, "that prospect does not give a claimant the license to attach a 'statutory violation' sticker to his or her claim and then to use that label as an asserted justification for a total failure to pursue the congressionally mandated internal appeal procedures." *Id.* at 1484.

Here, unlike in *Diaz*, Dooley alleges breach of fiduciary duty claims that rely exclusively on the duties of fiduciaries articulated in ERISA, 29 U.S.C. § 1104(a)(1). Such claims do not just vaguely "implicate" statutory requirements, they fundamentally depend on them. For this reason, courts hold that breach of fiduciary duty claims arise under ERISA, not a particular plan's provisions, and therefore need not be exhausted at the administrative level. *See Graphic Communications Union*, 917 F.2d at 1187.

## II.    Motion to Compel

On August 22, 2012, plaintiff served interrogatories and requests for production on defendants, seeking a variety of information about the Plan's administrative review committee, the November 2010 amendments, local passbook interest rates, valuations of Jeld-Wen stock since 2005, communications with Plan participants, the existence of Plan participants similar to Dooley, and potential trial witnesses. (P.'s Memo., #40, Ex. A.) Defendants objected that plaintiff's requested discovery was premature, considering the motion to stay discussed above.[6] *Id.* Defendants also made objections based on privilege and confidentiality, among other grounds. *Id.*

Plaintiff now moves to compel, arguing that: (1) discovery should not be stayed because of the motion to stay; (2) defendants' privilege objections should be overruled because they have not produced a privilege log as required under Fed. R. Civ. P. 26(b)(5); and (3) defendants' confidentiality objections should be overruled because they have not proposed a confidentiality

---

[6] The motion to stay, however, had not yet been filed at the time of defendants' response to discovery requests.

order as required under the Joint Rule 16 Report (#27, ¶5.) Because I recommend denying the

motion to stay, I need only address the second and third issues.

The Ninth Circuit holds that "boilerplate objections or blanket refusals inserted into a

response to a Rule 34 request for production of documents are insufficient to assert a privilege."

*Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Court for Dist. of Mont.*, 408 F.3d 1142, 1149

(9th Cir. 2005). District courts analyze a number of factors in a "holistic reasonableness

analysis" to determine whether privilege is waived by failing to provide a privilege log within the

30 days required for responses under Rule 34. *Id.* One of those factors is "the degree to which

the objection or assertion of privilege enables the litigant seeking discovery and the court to

evaluate whether each of the withheld documents is privileged." *Id.* Providing a privilege log is

presumptively sufficient to satisfy this factor, while relying on boilerplate objections is

presumptively insufficient. *Id.* Defendants argue that given the "unique circumstances" of

ERISA's exhaustion requirement and the strong likelihood that there will be no discovery beyond

the administrative record, the court should defer consideration of privilege claims. But because a

exhaustion of remedies is not required for plaintiff's claims, discovery will not be limited to the

administrative record. Defendants should be ordered to either produce a privilege log explaining

the basis for their privilege or produce the requested discovery.

Meanwhile, defendants' confidentiality objections are apparently just placeholders.

Defendants state that after the pending motions are resolved, they will submit an appropriate

confidentiality order under which production of confidential information can occur.

Ultimately, defendants resistance to plaintiff's motion to compel boils down to a request

to stay all discovery while plaintiff exhausts administrative remedies. Because exhaustion is not required for plaintiff's claims, discovery must proceed.

## CONCLUSION

For the reasons discussed above, defendants motion to stay pending Dooley's exhaustion of his administrative remedies (#43) should be denied and Dooley's motion to compel (#39) should be granted.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.

Dated this 12th day of December, 2012.

Honorable Paul Papak
United States Magistrate Judge